NOT RECOMMENDED FOR PUBLICATION

File Name: 12a1304n.06

No. 11-1308

**FILED**
*Dec 20, 2012*
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| SANDRA MCCANDLESS, | ) |
| | ) ON APPEAL FROM THE UNITED |
| Plaintiff-Appellant, | ) STATES DISTRICT COURT FOR |
| | ) THE EASTERN DISTRICT OF |
| v. | ) MICHIGAN |
| | ) |
| STANDARD INSURANCE COMPANY, a | ) |
| subsidiary of StanCorp Financial Group, Inc., | ) |
| | ) |
| Defendant-Appellee, | ) |
| | ) |
| and | ) |
| | ) |
| COUNTRYWIDE HOME LOANS, | ) |
| | ) |
| Defendant. | ) |

**BEFORE: WHITE, STRANCH, and FARRIS,[*] Circuit Judges**.

**HELENE N. WHITE, Circuit Judge.** Sandra McCandless brought suit against Standard Life Insurance Company under the Employee Retirement Income Security Act (ERISA) over Standard's denial of long-term disability insurance benefits. The district court held that the denial of benefits was not arbitrary and capricious. We REVERSE and REMAND.

---

[*]The Honorable Jerome Farris, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

1

**I.**

Countrywide Home Loans employed McCandless as a manager. Countrywide provided McCandless with a Group Long Term Disability Insurance Policy governed by ERISA and administered by Defendant Standard. In early February 2005, McCandless went on medical leave. The parties dispute what caused her to do so.

The record shows McCandless had vision problems that began in late 2004 and led her to see an ophthalmologist, Scott Wilkinson, in December of that year. Dr. Wilkinson diagnosed uveitis, a swelling of the middle layer of the eye. Wilkinson linked the uveitis to ankylosing spondylitis ("AS"), an inflammatory disease that causes back pain, progressive stiffness of the spine, arthritis, and fusing of certain joints. McCandless apparently had been diagnosed with AS in 1992. Wilkinson noted in his diagnosis that McCandless carries a gene associated with AS.

Wilkinson did not treat McCandless for the underlying AS. He discussed the possibility of a rheumatology consultation with McCandless and referred her to several rheumatologists. For the uveitis, Wilkinson prescribed steroids. The uveitis began to improve before McCandless went on medical leave in February 2005.

A second possible explanation for McCandless's medical leave is severe depression. The record does not reveal exactly when this condition began, but McCandless began seeing psychiatrist Marieta Jamsek-Tehlirian on February 22, 2005, about three weeks after going on medical leave.

In March 2005, McCandless's regular doctor of twenty years, Theodore Engelmann, and Dr. Jamsek-Tehlirian separately recommended extension of McCandless's medical leave. Dr. Engelmann did not explain his decision, but his letter stated that he "extended" McCandless's

2

medical leave and that the dates could change "depending on her medical condition." Dr. Jamsek-Tehlirian advised Standard that medical leave was necessary because of McCandless's depression.

In April 2005, McCandless applied to Standard for disability benefits. The Policy required McCandless to submit three forms with her claim: (1) an Attending Physician's Statement, (2) an Employer Statement, and (3) an Employee Statement. McCandless submitted an Attending Physician's Statement signed by Dr. Jamsek-Tehlirian, which listed a diagnosis of "Major Depressive Illness" and related mental health symptoms. There was no mention of AS.

In response to prompting from Standard, McCandless filed her Employee Statement in June 2005, and described her illness as "severe depression." In response to a question about how her condition affected her ability to work, McCandless responded: "Unable to concentrate, or focus. Unable to handle stress created. Because of lack of support—depression is amplified." McCandless's Employee Statement did not mention AS.

Countrywide later filed an Employer Statement to complete McCandless's application. In June 2005, Standard authorized short-term disability benefits, retroactive to February 2, 2005, when McCandless's medical leave began. Standard told McCandless that the short-term disability benefits were limited to 180 days and encouraged her to check her eligibility for long-term benefits.

The Policy authorized long-term disability benefits based on mental health conditions. In July 2005, Dr. Jamsek-Tehlirian sent Standard more details about McCandless's psychiatric treatment. Jamsek-Tehlirian described McCandless as presenting with anxiety, depression, insomnia, tiredness, and inability to focus. The precipitating factor was work-related stress. Jamsek-Tehlirian's treatment consisted of psychotherapy and psychiatric medication. Jamsek-Tehlirian

3

opined that McCandless could not return to work and that further assessment of her stress at work was necessary.

After a review by its own psychiatrist, who agreed with Dr. Jamsek-Tehlirian's recommendation, Standard authorized long-term disability benefits. The benefits were retroactive to the July 31, 2005 end of the Policy's Benefit Waiting Period. The Policy limited benefits for mental-health disorders to two years. In January 2006, Standard notified McCandless by letter that the two-year period would end on July 31, 2007, and encouraged her to submit documentation as soon as possible of other conditions that were not subject to the time limitation.

In February 2006, Standard asked McCandless for information showing she was still disabled. Dr. Jamsek-Tehlirian sent Standard a document titled "Physician's Report—Psychiatric." Under the heading of "Clinical Disorders," Jamsek-Tehlirian listed "Major Depressive Illness, severe"; "Anxiety disorder"; and "Anxiety d[isorder] with panic attacks." Under the heading of "General Medical Conditions," Jamsek-Tehlirian listed "spondylitis" and "tachycardia." McCandless also sent Standard an "Activities of Daily Living" form that described her "current" medical condition as "depression—and most recently shortness of breath and rapid heart rate." McCandless listed the conditions for which she saw a doctor as depression, AS, and rapid heart rate.

In May 2007, Standard sent McCandless a letter reminding her that her mental-health benefits would expire in July. McCandless called her case manager and asked that Standard consider a claim based on AS; she informed the case manager that she was disabled due to a mitral valve problem and spondylitis.

Standard received a letter from McCandless on June 15, 2007, in which McCandless stated that it appeared that Standard had overlooked her AS. She asserted that Drs. Engelmann and Jamsek-Tehlirian "have been treating me together because of the complications of the spondylitis," and that she believed Dr. Jamsek "has continually notified . . . Standard of the complications she is having with my depression because of the spondylitis." AR 280.

Over the next several months, McCandless, McCandless's doctors, and McCandless's lawyer exchanged phone calls and letters with Standard concerning an AS-based claim. In June 2007, Dr. Jamsek-Tehlirian wrote Standard a letter stating: "As you know I have been treating her since February 22, 2005 for symptoms of Major Depressive Illness . . . . She has been physically very limited due to exacerbation of Spondilytis, which gives her severe back pain and Uveitis, which impaired her vision. She has been treated by her primary doctor Engelmann." Dr. Jamsek-Tehlirian's letter also stated that McCandless "will . . . follow with specialist Rheumatologis[t]."

Standard closed McCandless's long-term disability claim on July 31, 2007, after having paid her claim for 24 months, the maximum benefit period for disabilities caused or contributed to by mental disorders.

In August 2007, Standard's Administrative Review Unit, which reviews recommendations to deny claims, wrote McCandless requesting additional medical records, and requesting that Dr. Engelmann supplement the records he had provided by submitting copies of all her medical records. Standard wrote that Dr. Jemsek's letter of June 29, 2007 "indicated that you were to be evaluated by a rheumatologist. If you did, in fact, consult a rheumatologist shortly thereafter, the

rheumatologist's records would also be helpful in assessment of your physical condition(s)." AR 255. I

In January 2008, McCandless called Sandra Bertha, a Senior Benefits Review Specialist. During their hour-long conversation, McCandless told Bertha that Dr. Engelmann was appalled that the Standard neurologist who reviewed her records opined that the radiological studies did not show abnormalities of AS. Bertha's memo summarizing this phone conversation then stated:

> We discussed the fact that generally, Rheumatologists are the medical specialists that treat Ankylosing Spondylitis. I asked if she had consulted a rheumatologist, to which she responded, "no." She said that Dr. Engelmann has been her doctor for many years and she is comfortable with his treatment. She said that it has been suggested that she consult a rheumatologist, but because she has done research and found that the medications that a rheumatologist would want her to take are injectables or cause cancer, like "Enbrel," she's not interested in that kind of treatment.
>
> To this, I explained that since she is reporting severe debilitating pain due to [AS], we would reasonably expect that she at least consult a rheumatologist . . . .

AR 181–82.

Doctor Elias Dickerman, a neurologist Standard often employed to review claims, reviewed McCandless's file three times. Standard's Administrative Review Unit had rheumatologist Shirley Ingram review the file. Doctors Dickerman and Ingram both concluded that the medical records supported a diagnosis of AS but that the lack of clinical findings precluded a finding of disability. They also noted that Dr. Engelmann's excuse that he had to treat McCandless's depression rather than her AS made little sense given the claimed severity of her symptoms and the availability of effective treatment. They recommended denial of her claim.

In March 2008, Standard issued a final decision denying long-term disability benefits based on AS. When Standard notified McCandless of this decision, it repeated that the problem with her claim was the lack of clinical findings. It also noted that McCandless's failure to see a rheumatologist meant she had failed to satisfy the Policy's "Care of a Physician" provision, which conditioned disability benefits on the claimant receiving appropriate specialist care.

After exhausting her administrative remedies under ERISA, McCandless filed suit against Standard and Countrywide in September 2008. She later voluntarily dismissed Countrywide. In June 2009, Standard answered McCandless's amended complaint and counterclaimed for overpayment of benefits based on the Social Security Administration's determination in late April 2009 that McCandless had been disabled since February 1, 2005. R. 44-3 at 6. After limited discovery, McCandless moved for summary judgment and Standard moved for judgment on the administrative record. The district court denied the former motion and granted the latter. McCandless appeals with respect to Standard's denial of long-term disability benefits but not with respect to its counterclaim for overpaid benefits.

## II.

We review *de novo* the district court's grant of Standard's motion for summary judgment on the administrative record. *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010). The Plan gave Standard substantial discretion in awarding benefits, thus McCandless bears the burden of proving the denial of benefits was arbitrary and capricious. *Fahrner v. United Transp. Union Discipline Income Prot. Prog.*, 645 F.3d 338, 343 (6th Cir. 2011).

7

Standard relied on the Policy's "Care of a Physician" provision in denying McCandless benefits. That provision provides:

> You must be under the ongoing care of a Physician in the appropriate specialty as determined by us during the Benefit Waiting Period. No [long-term disability benefits] will be paid for any period of Disability when you are not under the ongoing care of a physician in the appropriate specialty as determined by us.

Standard's reliance on this provision is problematic. Both Drs. Dickerman and Ingram faulted McCandless for failing to see a rheumatologist. But Standard never told McCandless that she would be ineligible for benefits if she did not see a rheumatologist. Further, Dr. Engelmann explained in his letter that he advised McCandless that there would be little difference between his treatment and the treatment a rheumatologist would provide. The one potential difference would have been Enbrel, a costly and potentially risky form of treatment that McCandless was hesitant to try. Standard's decision to deny benefits, based in large part on the fact that McCandless did not see a rheumatologist, is suspect, particularly considering that it did not exercise its authority under the Policy to have a rheumatologist conduct an independent medical evaluation of McCandless.

Because Standard both evaluates and pays claims on the Policy, we must take into account its incentive to cut costs. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). Although our review in ERISA actions is deferential, the arbitrary and capricious standard is not a "rubber stamp [of] the administrator's decision." *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 328 (6th Cir. 2009) (alteration in original ) (citation and internal quotation marks omitted). In this case, Standard is operating under a conflict of interest, which "is a red flag that may trigger a somewhat more searching review." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 312–13 (6th Cir. 2010).

Applying that review, we cannot say that Standard's benefit determination was the result of a deliberate and principled decision-making process. *See Balmert*, 601 F.3d at 501 (citation omitted).

We conclude that the decision to reject McCandless's claim without having a rheumatologist conduct an independent medical examination was arbitrary and capricious. There is no question that McCandless has AS and that she has experienced symptoms since at least 2004 when she presented to Dr. Wilkinson for uveitis. And neither of Standard's independent reviewers—Dickerman or Ingram—disputed that McCandless experienced pain due to her AS. Indeed, Dr. Dickerman conceded that, "[t]he main issue has always been the level of pain" and the resulting limitations on her functionality. Dr. Engelmann found that McCandless suffered debilitating pain due to her AS. Given the nature of the diagnosis and the lack of evidence showing that McCandless did not suffer debilitating pain (other than the conclusion that she did not take the amount of pain medication one would expect a person with debilitating pain to take), the issue was one of credibility. In a similar circumstance we observed "[a]s this court has repeatedly found, . . . where an administrator exercises its discretion to conduct a file review, credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary." *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 395–96 (6th Cir. 2009); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) ("[T]he failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination.").

For these reasons, we REVERSE and REMAND to the district court with instructions to remand to the plan administrator for a full and fair review of McCandless's claim, which presumably will include a rheumatology evaluation.