# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-3159

_____

Lisa Gerhardt

*Plaintiff - Appellant*

v.

Liberty Life Assurance Company of Boston; Universal Health Services, Inc.; UHS of Delaware, Inc.; Bridgeway, Inc.

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 25, 2013
Filed: November 29, 2013

_____

Before WOLLMAN, BEAM, and SMITH, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Lisa Gerhardt appeals from the district court's[1] order denying her motion for judgment on the record, affirming Liberty Life Assurance Company of Boston's

_____

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas.

(Liberty) decision to terminate payment of her long-term disability benefits, and dismissing her complaint with prejudice. We affirm.

## I. Background

Gerhardt obtained an associate's degree in nursing in 1980 and thereafter obtained a registered nurse's license. From 1980 to 2000, Gerhardt worked as a registered nurse and held other positions within the healthcare field. In July 2000, Gerhardt stopped working because she suffered from osteoarthritis and needed to undergo anthroplasty surgery on each of her thumbs. At the time, she was employed as the Director of Addiction Services for a psychiatric hospital, the Bridgeway, Inc., which was owned and operated by Universal Health Services, Inc.[2] Universal Health Services provided long-term disability coverage to its employees under a Group Disability Income Policy (the Policy) issued by Liberty. Gerhardt filed a claim for long-term disability benefits with Liberty in October 2000.

To receive long-term disability benefits, the Policy required insured employees to provide Liberty with proof of disability. As relevant to this case, the Policy defines "Disability" or "Disabled" as follows:

i.     If the Covered Person is eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and

ii.     After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the

---

[2]UHS of Delaware, Inc., is the management company for Universal Health Services, Inc.

material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

Accordingly, the initial determination of whether an employee is "Disabled" is dependent upon whether the employee is able to perform his or her own occupation, whereas after the employee has received benefits for twenty-four months, the determination is dependent upon whether the employee can perform his or her own occupation or any occupation for which the employee is reasonably fitted.

Liberty approved Gerhardt's claim under the first standard and began paying her long-term disability benefits on November 5, 2000. Thereafter, Gerhardt was diagnosed with various medical conditions including fybromyalgia, depression, arthritis, and osteoporosis. In 2002, Liberty reevaluated Gerhardt's claim under the second standard—the "any occupation" standard—and determined that Gerhardt continued to qualify for benefits under the Policy. Liberty, however, notified Gerhardt that her claim would be evaluated periodically.

In 2004 and 2005, Gerhardt participated in two separate Independent Medical Evaluations (IME) at Liberty's request. Barry Baskin, M.D., and Bruce Safman, M.D., separately evaluated Gerhardt and concluded that she was capable of performing full-time sedentary work despite her various medical conditions. In 2005, Teresa Marques, a vocational consultant, completed a Transferable Skills Analysis (TSA) based on her review of Gerhardt's file and standard vocational resources. Marques identified five occupations Gerhardt could perform that were consistent with the "any occupation" standard.

Gerhardt's family practice doctor, however, opined that Gerhardt was disabled and could not hold a full-time job. Thereafter, a physical therapist who had been hired by Liberty performed a Functional Capacity Evaluation (FCE) of Gerhardt and

concluded that Gerhardt was capable of performing sedentary work. Additionally, Liberty hired a separate vocational consultant to review the TSA, who confirmed that Gerhardt was capable of performing each of the five occupations Marques had previously identified. On May 1, 2006, Liberty notified Gerhardt of its decision to terminate payment of her long-term disability benefits as of May 5, 2006. Liberty concluded that Gerhardt was no longer eligible for disability benefits because she was capable of performing full-time sedentary work.

Gerhardt appealed Liberty's decision to terminate benefits, and Liberty again denied Gerhardt's claim. Gerhardt then sought judicial review of Liberty's adverse benefits determination under the Employee Retirement Income Security Act (ERISA). See 29 U.S.C. § 1132(a)(1)(B). The district court reversed Liberty's decision to terminate benefits and remanded Gerhardt's claim to Liberty for further proceedings. The district court concluded that substantial evidence supported Liberty's determination that Gerhardt was physically capable of performing the occupations identified in the TSA, but concluded that Liberty had not adequately addressed whether Gerhardt was mentally capable of performing those occupations. Accordingly, the district court instructed Liberty to "consider not only Gerhardt's physical impairments, but also her mental impairments, the side effects of any necessary medications, her age, and other considerations contained in the administrative record." D. Ct. Order of June 17, 2008, at 29. The district court also advised the parties to "consider obtaining a new transferable skills analysis report." Id. Liberty appealed, and we dismissed the appeal for lack of jurisdiction. See Gerhardt v. Liberty Life Assurance Co. of Boston, 574 F.3d 505 (8th Cir. 2009). On remand, Gerhardt submitted additional information for Liberty's review and underwent further medical assessments. Ultimately, Liberty adhered to its decision to terminate benefits. Gerhardt moved to reopen the case and then moved for judgment on the record, requesting that the district court order Liberty to pay her claim.

## II. Termination of Benefits

Because it is undisputed that the Policy gave Liberty discretionary authority to determine Gerhardt's eligibility for benefits, we review Liberty's decision for abuse of discretion. See Norris v. Citibank, N.A. Disability Plan (501), 308 F.3d 880, 883 (8th Cir. 2002). Under the abuse of discretion standard of review, we do not "substitute our own weighing of the evidence for that of the administrator." Sahulka v. Lucent Techs., Inc., 206 F.3d 763, 769-70 (8th Cir. 2000). Instead, "a plan administrator's decision will stand if reasonable; '*i.e.*, supported by substantial evidence.'" Ortlieb v. United HealthCare Choice Plans, 387 F.3d 778, 781 (8th Cir. 2004) (quoting Fletcher-Merrit v. NorAm Energy Corp., 250 F.3d 1174, 1179 (8th Cir. 2001)). "We review the district court's application of this standard *de novo*." Norris, 308 F.3d at 884.

"A plan administrator abuses its discretion when it ignores relevant evidence." Willcox v. Liberty Life Assurance Co. of Boston, 552 F.3d 693, 701 (8th Cir. 2009). Gerhardt argues that Liberty abused its discretion in terminating her long-term disability benefits because it entirely ignored evidence that supported her claim. Specifically, Gerhardt contends that Liberty ignored the following evidence: Gerhardt's loss of her registered nurse's license and lack of a bachelor's degree, Dr. Safman's original IME report, and Gerhardt's age.[3]

---

[3]At oral argument, Gerhardt clarified that she is not arguing that "these pieces of evidence were misconstrued or misunderstood by Liberty" or that "Liberty underweighted them somehow." Instead, she argues that "Liberty entirely refused to consider these three pieces of evidence."

## A. Expiration of Nurse's License and Absence of a Bachelor's Degree

Gerhardt's registered nurse's license expired after she stopped working in 2000. When vocational consultant Marques completed the original TSA in 2005, she concluded that Gerhardt was capable of and reasonably fitted to perform the following occupations: community health/program director; nurse case manager; utilization review nurse; health services coordinator; and ambulance/emergency service dispatcher. Marques twice updated the TSA after remand, concluding that Gerhardt could also work as a precertification nurse or a telephone triage nurse. On remand, Gerhardt submitted a Vocational Employability Assessment authored by a certified rehabilitation counselor for Liberty's review. The report concluded that Gerhardt's physical and cognitive limitations precluded her from performing any of the occupations identified in the TSA.

Gerhardt argues that Liberty abused its discretion in terminating her benefits because it failed to identify any occupation that she was both capable of and reasonably fitted to perform based on her training, education, experience, age, and physical and mental capacity. According to Gerhardt, six of the seven occupations identified in the TSA required either a registered nurse's license or a bachelor's degree. The only occupation that did not require a registered nurse's license or a bachelor's degree was ambulance/emergency service dispatcher. Because Gerhardt did not have a registered nurse's license or a bachelor's degree, she asserts she was not reasonably fitted to perform any of the six occupations identified. Gerhardt further contends that she was not reasonably fitted to perform the occupation of ambulance/emergency service dispatcher because her training, education, and experience are in the fields of nursing and healthcare, whereas the occupation of dispatcher is in the field of police work.

We conclude that Liberty did not abuse its discretion in determining that Gerhardt was reasonably fitted to perform the occupation of ambulance/emergency

service dispatcher. In making this determination, Liberty considered the report of Gerhardt's rehabilitation counselor. Liberty, however, ultimately chose to rely on the TSA completed by Marques, who considered Gerhardt's medical status, functional capacity, education history, work history, and vocational status in determining the occupations for which Gerhardt was reasonably fitted. In addition to her original analysis, Marques also updated the TSA twice after remand and continued to conclude that Gerhardt was reasonably fitted to perform the occupation of ambulance/emergency service dispatcher. Moreover, at least one other vocational expert reviewed the TSA and confirmed Marques's determination. Liberty had the discretion to weigh the evidence, and Gerhardt has not established that Liberty's reliance on the TSA was unreasonable. That Liberty rejected the conclusion of Gerhardt's rehabilitation counselor does not render its reliance on the TSA unreasonable. Similarly, although Gerhardt argues that a dispatcher works in the field of law enforcement and that law enforcement is unrelated to the fields of nursing and healthcare, Liberty relied on its experts' opinions to the contrary.

The Policy provides that an employee is not disabled if the employee is capable of performing any occupation for which he or she is reasonably fitted. Because Liberty has identified at least one occupation Gerhardt is both capable of and reasonably fitted to perform, we do not reach the merits of Gerhardt's contention that the expiration of her registered nurse's license made her unfit for all jobs requiring a registered nurse's license.

### B. Dr. Safman's Original IME Report

In 2005, Dr. Safman evaluated Gerhardt on behalf of MLS National Medical Evaluations (MLS), an independent contractor that coordinated the IME for Liberty. Dr. Safman prepared a report (the original IME report) and sent it to MLS. At the end of the original IME report, Dr. Safman indicated, "I believe with fibromyalgia, as severe as that which she appears to have, that there will be days when she could not

participate in sedentary activities, and there were other days that she could." MLS generated the final version of the report (the final IME report), which was longer and more detailed than the original IME report. Dr. Safman then signed the final IME report, and it was sent to Liberty. The final IME report concluded that Gerhardt was capable of performing full-time sedentary work and did not expressly include Dr. Safman's statement "that there will be days when [Gerhardt] could not participate in sedentary activities."

Gerhardt contends that Liberty abused its discretion by ignoring Dr. Safman's original IME report and withholding the report from its post-remand reviewers. According to Gerhardt, the statement set forth above supports her disability claim because it is evidence that she would be unable to perform an occupation "with reasonable continuity." Liberty, however, did not ignore Dr. Safman's original IME report.

On remand, Gerhardt specifically requested that Liberty consider the original IME report and submitted a copy of the report to Liberty. In its initial post-remand letter maintaining its decision to terminate benefits, Liberty acknowledged Gerhardt's request. Thereafter, Liberty repeatedly confirmed that it had reviewed Gerhardt's file, along with the additional evidence that she had submitted after remand. Therefore, although we do not know the exact weight Liberty afforded the original IME report, the record establishes that Liberty did not entirely ignore the report.

The record is not clear whether Liberty provided the original IME report to Marques and the physicians who evaluated Gerhardt after remand. Even assuming that those reviewers did not know of the report, Gerhardt has not shown that Liberty's decision to terminate benefits constituted an abuse of discretion. Dr. Safman's statement may have supported Gerhardt's claim, but it did not conclusively establish that she was disabled. Moreover, to the extent the original IME report and the final IME report are inconsistent, nothing in the record indicates that the final IME report

did not represent Dr. Safman's final opinion.  Liberty thus was in a position where it had considered the original IME report, it knew whether the reviewers had the original IME report, and it could weigh all of the evidence accordingly.

## C.  Age

The Policy requires Liberty to consider an employee's age in determining whether the employee is reasonably fitted for an occupation.  Gerhardt was fifty-two years old when her long-term disability benefits were terminated.  Gerhardt argues that Liberty failed to consider her age, either before or after remand, and thus abused its discretion.  Gerhardt acknowledges, however, that in the benefit-termination letters Liberty sent her prior to remand, Liberty indicated that it had considered her age in evaluating her claim.  Furthermore, Gerhardt's age was referred to in most of the reports issued by the reviewing physicians and vocational consultants both before and after remand.  In light of this evidence, Gerhardt has not established that Liberty ignored her age when it terminated its payment of her long-term disability benefits.

## III.  Conclusion

Gerhardt has not established that Liberty entirely ignored relevant evidence or that Liberty's decision to terminate its payment of long-term disability benefits was otherwise unreasonable.  The record reflects that Liberty's decision to terminate benefits was supported by substantial evidence and thus did not constitute an abuse of discretion.

The judgment is affirmed.

_____