NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0630n.06

No. 16-3387

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Nov 29, 2016
DEBORAH S. HUNT, Clerk

DANA LEPPERT,

     Plaintiff-Appellant,

v.

LIBERTY LIFE ASSURANCE CO.
OF BOSTON,

     Defendant-Appellee.

_____/

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF OHIO

BEFORE:    DAUGHTREY, CLAY, and COOK, Circuit Judges.

     **CLAY, Circuit Judge.** Plaintiff Dana Leppert appeals from the judgment entered by the district court on March 24, 2016, granting Defendant Liberty Life Assurance Company of Boston's ("Liberty") motion for summary judgment, and upholding Liberty's decision to terminate Leppert's long term disability benefits. On appeal, Leppert argues that Liberty's benefits termination was arbitrary and capricious in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1001 *et seq.* We have jurisdiction to entertain this appeal pursuant to 28 U.S.C. § 1291. For the reasons set forth below, we **AFFIRM** the district court's judgment.

## BACKGROUND

### I.   Factual Background

     Plaintiff Dana Leppert is a 60-year-old man formerly employed by Triumph Group Inc. ("Triumph"), an aircraft manufacturer. Leppert graduated from high school in 1974, and has never attended college or a trade school. Rather, Leppert has spent his entire adult life working

as a physical laborer in a variety of jobs ranging from farm work to washing and detailing automobiles. From 1999 to 2011, Leppert worked as a window repairman for Triumph's fleet of aircraft.

In 2011, at age 55, Leppert was performing maintenance on his car when he heard and felt several "pops" in his shoulders. (R. 11, Sealed Administrative Record, PageID #103.) Leppert was subsequently diagnosed with "[m]assive" rotator cuff tears in both shoulders and end-stage osteoarthritis in both knees, along with other smoking and obesity-related ailments. Leppert ceased working at Triumph in May 2011, and applied for Social Security disability benefits.

Leppert was examined by Dr. Elizabeth Das ("Dr. Das") in order to determine his eligibility for Social Security benefits. On December 13, 2011, Dr. Das issued a report finding Leppert disabled within the meaning of the Social Security Act. Dr. Das determined that Leppert suffers from three medically determinable impairments: (1) osteoarthritis and allied disorders; (2) degenerative disc disease in his back; and (3) major joint dysfunction. Dr. Das classified all three impairments as "[s]evere." (*Id.* PageID #235.) Based on these impairments, Dr. Das opined that Leppert was limited to "LIGHT"[1] work (*id.* PageID #207), and could only: (1) lift or carry twenty pounds for roughly two-to-three hours per day; (2) lift or carry ten pounds for roughly two-to-five hours per day; (3) stand or walk for six hours per day; and (4) sit for six hours per day. Dr. Das also noted that Leppert's ability to use his hands was "[u]nlimited." (*Id.* PageID #206.) On December 31, 2011, the Social Security Administration accepted Dr. Das' findings and awarded Leppert disability benefits beginning October 2011.

---

[1] Social Security regulations describe "light work" as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, the claimant must have the ability to do substantially all of these activities. If the claimant can do light work, the Board determines that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 220.132(b).

Leppert also sought disability benefits under Triumph's disability insurance plan with Defendant Liberty Life Assurance Company of Boston ("the Plan"). The Plan provides two methods of qualifying for long term disability benefits. First, if a worker becomes disabled from performing his own occupation, he can receive up to two years' worth of disability insurance payments. Second, if a worker becomes disabled from performing any occupation, he can continue to receive disability benefits until he is no longer disabled, or his maximum benefit period expires, which for Leppert would have been September 18, 2022.

On or around August 31, 2011, Liberty contacted Dr. Joseph Assenmacher ("Dr. Assenmacher"), Leppert's treating orthopedist, in connection with Leppert's claim that he was disabled from performing his own occupation. After speaking with Dr. Assenmacher, Liberty agreed that Leppert could no longer function as an airplane window repairman, and granted Leppert twenty-four months of disability benefits starting October 29, 2011. Leppert was eventually required to offset these benefits by his award from the Social Security Administration.

Liberty then began assessing Leppert's long term prognosis. In connection with this evaluation, Liberty enlisted Dr. Gale Brown, Jr. ("Dr. Brown") to evaluate Leppert's medical records. As part of this review, Dr. Brown contacted Dr. Assenmacher to discuss Leppert's ailments. Dr. Brown and Dr. Assenmacher agreed that Leppert could perform full-time work with the following restrictions:

- Occasional standing/walking, 10-15 minutes/session;
- Constant sitting, 45 minutes/session;
- No reaching/lifting above left shoulder level;
- Occasional lifting/carrying/pushing/pulling 10 lbs.
- No climbing/squatting/crouching/kneeling/crawling.

(*Id.* PageID #654.)

On May 3, 2012, Dr. Brown issued a report summarizing his findings. Relevant to this appeal, Dr. Brown concluded that: (1) Leppert suffered from permanent partial physical impairment in his shoulders and knees; (2) Leppert was therefore restricted to sedentary-light

work as defined in Department of Labor regulations; (3) Leppert's prognosis for resuming sedentary-light work was "excellent;" (4) there was "no evidence for functionally limiting comorbid diagnoses or medication side effects;" and (5) Leppert's various complaints were completely consistent with the conditions identified in his medical records. (*Id.* PageID #667–68.) On February 18, 2013, after reviewing additional medical records submitted by Leppert, Dr. Brown issued a supplemental report adhering to his conclusions expressed in the May 3, 2012 report.

After Dr. Brown issued his May 2012 report, Leppert was referred by Liberty to Ms. Lori Ashworth ("Ms. Ashworth"), a vocational rehabilitation counselor, to determine whether Leppert would be a good candidate for a job-retraining program. For reasons that are not entirely clear from the record, this analysis was never completed. Ms. Ashworth stated on May 22, 2012 that the analysis was being postponed so that Leppert could see Dr. Assenmacher about pain and numbness in his hands. However, Dr. Assenmacher's treatment notes for this period make no mention of any problems with Leppert's hands. In any event, on September 19, 2012 Ms. Ashworth made a notation in Leppert's file stating: "CONCLUDED [Leppert] NOT A GOOD CANDIDATE FOR [Vocational] RETRAINING PROGRAM." (*Id.* PageID #92.) Leppert was accordingly never afforded vocational retraining services.

On March 6, 2013, Liberty began formally reviewing whether Leppert was disabled from performing any occupation within the meaning of the Plan. As part of this review, Liberty asked Michelle Reddinger ("Ms. Reddinger"), a certified rehabilitation counselor, to conduct a vocational review and transferable skills analysis based on Dr. Brown's report to determine whether Leppert retained any skills that could help him find alternate employment. On March 8, 2013, Ms. Reddinger issued a report opining that Leppert possessed several transferable skills, including: (1) the ability to communicate effectively with others; (2) the ability to assemble objects; (3) the ability to read diagrams; (4) the ability to follow written and verbal instructions; (5) the ability to utilize basic computer applications; and (6) the ability to record information accurately. Based on these skills, and Leppert's "training, education, and experience," Ms.

Reddinger opined that Leppert could perform four occupations: (1) "Assembler, Small Products (e.g., bench);" (2) "Electronic Assembler (e.g., bench);" (3) "Information Clerk (e.g., mall, airport or visitor's center);" or (4) "Security Guard (e.g., badge checker)." (*Id.* PageID #503.)

Liberty also asked Dr. Martin Kanner ("Dr. Kanner") to conduct an independent peer review of Leppert's medical records. On July 23, 2013, Dr. Kanner issued a report opining that: (1) Leppert's knee and shoulder diagnoses were consistent with the medical evidence; (2) Dr. Brown was correct that Leppert would need to observe certain limitations in any physical work he conducted; and (3) Dr. Brown's recommended limitations could be observed in light or sedentary occupations.

On September 26, 2013, Liberty notified Leppert that, based on Ms. Reddinger and Dr. Kanner's reports, it had determined that Leppert was not disabled from performing any occupation, and therefore was not entitled to more than two years' worth of disability benefits, according to the terms of the Plan. Accordingly, Liberty terminated Leppert's benefits as of October 28, 2013. On March 24, 2014, Leppert filed a timely administrative appeal, enclosing: (1) Leppert's complete Social Security disability file; and (2) several sets of vocational documents. As part of the appeal, Leppert enclosed notes from April 2013 by Dr. Mark C. Nadaud ("Dr. Nadaud"), Leppert's treating physician, diagnosing Leppert with degenerative joint disease of the hands, and noting deformities in Leppert's fingers. In these notes, Dr. Nadaud expressly declined to evaluate whether Leppert's hand problems would diminish Leppert's work capacity, stating that a functional capacity evaluation would be necessary to assess the effects of Leppert's degenerative joint disease.

In order to evaluate Leppert's appeal, Liberty obtained an additional peer review of Leppert's medical records from Dr. Francesca Litow ("Dr. Litow"). In a report dated June 4, 2014, Dr. Litow confirmed that Leppert's shoulder and knee ailments were medically supported. Dr. Litow also opined that Leppert would need to work with physical restrictions including: (1) no reaching, lifting or work over shoulder level; (2) limit lifting to ten pounds frequently and

twenty pounds occasionally with both upper extremities; and (3) no climbing ladders, squatting, crawling, kneeling, or crouching.

Liberty issued a final decision denying Leppert's appeal on June 6, 2014. In its denial letter, Liberty reviewed the medical expert opinions in the record, including those offered by Dr. Das, Dr. Brown, Dr. Assenmacher, Ms. Reddinger, Dr. Kanner, and Dr. Litow, and noted that the experts generally agreed that Leppert could perform physical work with restrictions to account for his ailments. Liberty also stated that it had reviewed the Social Security Administration's benefits determination, and had denied benefits under the Plan because Liberty had the benefit of more recent medical records. Finally, Liberty addressed several specific arguments Leppert made in his administrative appeal, including that Leppert's degenerative joint disease in his hands would make him unsuited to perform any of the occupations identified by Ms. Reddinger in her vocational report. Liberty noted that there was no objective medical evidence in the record that Leppert's hand problems would limit his ability to work in the jobs identified by Ms. Reddinger.

## II. Procedural History

On August 11, 2014, Leppert brought suit in the United States District Court for the Southern District of Ohio, alleging that Liberty had illegally withheld benefits that Leppert was otherwise entitled to in violation of 29 U.S.C. § 1132(a)(1)(b). Liberty filed an answer on September 25, 2014, denying Leppert's allegations. On May 15, 2015, the parties filed cross-motions for summary judgment on the administrative record, essentially relitigating the same arguments that were involved in Leppert's administrative appeal.

On March 24, 2016, the district court granted Liberty's summary judgment motion and denied Leppert's motion. *Leppert v. Liberty Life Assur. Co. of Bos.*, No. 2:14-cv-1207, 2016 WL 1161957, at *6 (S.D. Ohio Mar. 24, 2016). The district court first determined that its review was limited to whether Liberty's benefits denial was arbitrary and capricious in light of the evidence in the administrative record. *Id.* at *2. The district court then reviewed the objective medical evidence Liberty relied upon at length, recounting the opinions of Drs. Brown, Assenmacher,

Kanner, Litow, and Das, as well as Ms. Reddinger. *Id.* at *3. The district court concluded that Leppert had failed to carry his burden of presenting objective medical evidence to show that he was disabled from performing any occupation, as required by the Plan. *Id.* at *4. The district court further concluded that Liberty did not act arbitrarily or capriciously in crediting the expert evidence in the record, nearly all of which found that Leppert could still perform light or sedentary work. *Id.* at *4–5. The district court rejected Leppert's argument that Liberty had arbitrarily ignored the Social Security Administration's disability determination, noting that none of the Social Security documents in the record purported to find that Leppert was incapable of performing even light or sedentary work. *Id.* at *5. Finally, the district court rejected Leppert's argument that Liberty had improperly calculated the benefits he was owed during his initial two years of disability. *Id.* at *5–6.

The district court entered judgment against Leppert on the same day it released its opinion granting summary judgment. On April 15, 2016, Leppert filed a timely notice of appeal.

## DISCUSSION

### I.    Standard of Review

We review *de novo* "the district court's disposition of an ERISA action based upon the administrative record, and apply the same legal standard as the district court." *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 328 (6th Cir. 2009). The legal standard governing our review of an ERISA plan administrator's benefits determination differs based on the terms of the plan. Where the plan "gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan," we review the administrator's determination "under an 'arbitrary and capricious' standard." *Morrison v. Marsh & McLennan Cos., Inc.*, 439 F.3d 295, 300 (6th Cir. 2006) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)). Where no such discretion is granted, our review is *de novo*. *Id.* Regardless of which standard applies, our review is confined to the documents contained in the administrative record. *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010).

"Review under the arbitrary and capricious standard is the least demanding form of judicial review of an administrative action; it requires only an explanation based on substantial evidence that results from a deliberate and principled reasoning process." *Morrison*, 439 F.3d at 300. "Nonetheless, this deferential standard is 'tempered' by any possible conflict of interest where the Plan Administrator both determines eligibility and funds the Plan." *Farhner v. United Transp. Discipline Income Protection Program*, 645 F.3d 338, 342 (6th Cir. 2011) (quoting *Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000)). "[S]uch a conflict is a red flag that may trigger a somewhat more searching review of a plan administrator's decision," although "the arbitrary and capricious standard remains in place." *Schwalm*, 626 F.3d at 311–12.

A structural conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking [sic] irrespective of whom the inaccuracy benefits." *Id.* "Mere allegations of the existence of a structural conflict of interest are not enough to show that the denial of a claim was arbitrary; there must be some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits." *Jackson v. Metro. Life*, 24 F. App'x 290, 292 (6th Cir. 2001) (citing *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998)); *Iley v. Metro. Life Ins. Co.*, 261 F. App'x 860, 864 (6th Cir. 2008) (same).

Here, the Plan provides:

Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions

regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

(R. 11 PageID #65.) The parties agree that this language confers sufficient discretion upon Liberty to trigger the arbitrary and capricious standard of review. *Morrison*, 439 F.3d at 300. Leppert argues that because Liberty both determines Plan eligibility and funds the Plan, it has a structural conflict of interest that should temper the deference we accord Liberty's decision. However, Leppert has put forward no evidence showing that Liberty's conflict influenced its decision in this case, or that Liberty has a history of biased claims administration. Accordingly, Liberty's conflict has little bearing on this appeal, and we will review Liberty's benefits determination under the full deference accorded by the arbitrary and capricious standard. *Glenn*, 554 U.S. at 117; *Peruzzi*, 137 F.3d at 433 (holding that structural conflict was not important where "the record reveal[ed] no significant evidence that [plan administrator] based its determination on the costs associated with [claimant's] treatment or otherwise acted in bad faith").

## II.   Liberty's Benefits Determination

Leppert offers a wide range of arguments criticizing Liberty's benefits determination, and urges us to find that Liberty's conclusion was arbitrary and capricious. We have reviewed the record in detail, and disagree. We hold that Liberty reasonably concluded based on substantial record evidence that Leppert was not totally disabled within the meaning of the Plan.

Under the Plan's terms, in order to receive long term disability coverage, Leppert was required to provide "Liberty Proof of continued . . . Disability." (R. 11 PageID #45.) Relevant here, Disability means that "the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of Any Occupation." (*Id.* PageID #36.) "Material and Substantial Duties" are defined as "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." (*Id.* PageID #38.) "Any Occupation" is defined as "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity [sic]." (*Id.* PageID #35.)

'**Proof**" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:

1.    a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;

2.    an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and

3.    the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

(*Id.* PageID #39.)

Moreover, the Plan also provides that in "determining whether the Covered Person is Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of professional or occupational license or certification." (*Id.* PageID #45.)

Thus, applying the Plan's terms, in order to obtain benefits, Leppert was required to provide objective medical evidence showing that there was no occupation that he could perform in light of his age, skills, education, and physical and mental health. Liberty determined that there were occupations that Leppert could perform even with his physical ailments. In order to disturb this finding on appeal, Leppert must show that Liberty's determination was not based on substantial record evidence and did not result from a "deliberate and principled reasoning process." *Morrison*, 439 F.3d at 300. Leppert has not made this showing.

The record shows that Liberty evaluated the conclusions of six medical experts. Five of those experts offered opinions on whether Leppert could still perform full-time employment, and all five indicated that he could perform such work, with four opining specifically that he could perform light or sedentary work. The sixth medical expert (Dr. Litow) opined that Leppert required physical restrictions consistent with those proposed by the other experts. The medical experts were thus unanimous that Leppert could perform physical work with restrictions designed to accommodate Leppert's admittedly severe shoulder and knee problems. And Ms.

Reddinger opined that there were specific jobs within the light and sedentary work classifications that would conform to Leppert's restrictions.

We hold that, under the facts presented here, it was not arbitrary and capricious for Liberty to rely on the unanimous conclusions of so many medical experts in determining whether Leppert could perform "Any Occupation" within the meaning of the Plan. Liberty's benefits denial letter shows that it reviewed the administrative record in detail, considered the conclusions of medical experts, considered Leppert's arguments for deviating from the experts' conclusions, and made a reasoned determination to accept the conclusions of the various doctors and vocational experts that either examined Leppert in person, or reviewed his medical records. Because Leppert did not offer objective medical evidence contradicting the experts' conclusions, the law requires no more. *See, e.g.*, *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 660 (6th Cir. 2013) (affirming benefits denial where claimant failed to provide objective medical evidence contradicting expert opinions that he could return to work); *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 950 (6th Cir. 2005) (affirming benefits denial where insurer relied on medical records review from two independent physicians who concluded that claimant was not disabled within the plan's meaning); *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 614 (6th Cir. 1998) (affirming benefits denial of claim based on rotator cuff injuries where claimant failed to provide objective medical evidence supporting claim, and where none of the doctors who examined claimant "determined that he [was] disabled or unable to return to work indefinitely").

Leppert offers a laundry list of arguments attacking the methodology employed by the medical experts. Although some of these arguments state potentially valid criticisms of the experts' review, we note that under the Plan's terms, it is insufficient for Leppert to merely cast doubt on the medical evidence Liberty relied upon in making its benefits determination. Rather, Leppert bore the burden of proving his disability through objective medical evidence, and on appeal, Leppert bears the higher burden of showing that Liberty unreasonably weighed the evidence in making its benefits determination. *Judge*, 710 F.3d at 661; *Likas v. Life Ins. Co. of*

*N. Am.,* 347 F. App'x 162, 167 (6th Cir. 2009) ("Plaintiff must provide 'continued proof' of his disability under the policy; LINA does not bear the burden of showing that plaintiff's eligibility has ended."). Because Leppert offered neither contradictory expert evidence showing that he could not perform any light or sedentary job, nor evidence showing that Liberty's benefits determination was infected by bias, we hold that Leppert has not shown that Liberty acted arbitrarily and capriciously by simply accepting the conclusions drawn by the experts who reviewed Leppert's medical history. Nevertheless, we will review each of Leppert's arguments in turn.

### III. Leppert's Arguments

#### A. Failure to Discuss Leppert's Age

First, Leppert argues that the Plan explicitly required Liberty to consider Leppert's age in determining whether Leppert could perform Any Occupation, that Liberty failed to do so, and that Liberty's failure rendered its benefits determination arbitrary and capricious. Leppert argues that if Liberty had considered his age, it would have realized that as a 60-year-old man with severe medical problems, limited education, and limited job skills, Leppert was unlikely to be able to acquire the kinds of new skills necessary to obtain any of the light or sedentary jobs Ms. Reddinger identified in her report. In support of this argument, Leppert cites Social Security regulations related to the determination of disability benefits for persons "limited to light work as a result of severe medically determinable impairment(s)." 20 C.F.R. Pt. 404, Subpt. P, App'x 2, § 202.00(c). Those regulations provide that:

> [F]or individuals of advanced age who can no longer perform vocationally relevant past work and who have a history of unskilled work experience, or who have only skills that are not readily transferable to a significant range of semi-skilled or skilled work that is within the individual's functional capacity, or who have no work experience, the limitations in vocational adaptability represented by functional restriction to light work warrant a finding of disabled. Ordinarily, even a high school education or more which was completed in the remote past will have little positive impact on effecting a vocational adjustment unless relevant work experience reflects use of such education.

*Id.*

As Leppert correctly notes, these regulations were not binding on Liberty in making its benefits determination. *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833–34 (2003); *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 294 (6th Cir. 2005). But Leppert's argument suffers from a more fundamental problem. Leppert's age was included in the medical records reviewed by Ms. Reddinger and the rest of the medical experts that Liberty asked to review Leppert's files. Thus, when Ms. Reddinger opined that Leppert could perform existing light and sedentary occupations, she made that determination despite knowing Leppert's age. Therefore, Liberty implicitly considered Leppert's age in crediting Ms. Reddinger's findings. Nothing in the Plan required Liberty to explicitly mention Leppert's age in denying his benefits request, and in light of Liberty's detailed explanation recounting the medical evidence in the administrative record, we cannot say that Liberty's failure to discuss Leppert's age rendered its decision arbitrary and capricious.

We are not persuaded by the cases Leppert cites in support of his argument. In *Filipowicz v. American Stores Benefit Plans Committee*, 56 F.3d 807, 814 (7th Cir. 1995), the court held that the plan administrator's decision to read limitations into the plan documents that were not reflected in the plan's plain language was arbitrary and capricious. And in *Dalesandro v. International Paper Co.*, 214 F.R.D. 473, 479–80 (S.D. Ohio 2003), the district court concluded that the plan administrator's decision to ignore plan provisions that triggered benefits upon the claimant's termination was arbitrary and capricious. These cases involved the plan administrator contradicting express plan language, and have little applicability here.

The Western District of Arkansas's decision in *Mackey v. Liberty Life Assurance Co. of Boston*, 168 F. Supp. 3d 1162, 1171 (W.D. Ark. 2016) is considerably more relevant, but ultimately inapposite. In *Mackey*, a 63-year-old claimant sought long term disability benefits from Liberty under a materially similar plan. The district court faulted Liberty for failing to discuss whether the claimant's age and lack of computer training would render her unable to obtain employment in the occupations suggested by Liberty's vocational expert, and remanded for a new benefits determination. *Id.* Unlike Leppert, however, the *Mackey* claimant offered her

13

own vocational expert contradicting the analysis performed by Liberty. *Id.* at 1169. Liberty's failure to evaluate the claimant's age was thus more relevant, since Liberty was required to weigh the competing evidence and offer a reasoned basis for trusting its own expert over the claimant's. *Id.* Because Leppert offered no expert evidence suggesting that he lacks the skills to perform the jobs identified by Liberty here, however, *Mackey* is not on point.

Rather, we are more persuaded by the Eighth Circuit's decision in *Gerhardt v. Liberty Life Assurance Co. of Boston*, 736 F.3d 777, 783 (8th Cir. 2013). There, as in *Mackey*, the claimant sought long term disability benefits from Liberty under a plan materially similar to the one at issue here. The 52-year-old claimant argued that Liberty had acted arbitrarily and capriciously by failing to discuss her age in determining whether she could adequately perform the occupations identified by Liberty's vocational expert. *Id.* The Eighth Circuit rejected this argument because Liberty's first benefits determination letter mentioned that it had considered her age, and because "most of the reports issued by the reviewing physicians and vocational consultants" mentioned her age. *Id.*

Here, although Liberty never mentioned Leppert's age in any of its benefits denial letters, each of the experts Liberty relied upon noted Leppert's age in conducting their review. As in *Gerhardt*, we hold that Liberty did not impermissibly fail to consider Leppert's age in light of its otherwise detailed record review, its reliance on experts who considered Leppert's age, and Leppert's failure to provide contradictory expert testimony.

### B. Conflicting Vocational Opinions

Second, Leppert argues that Liberty's determination was arbitrary and capricious because it failed to explain why it accepted Ms. Reddinger's vocational report over conflicting vocational determinations in the record. Specifically, Leppert argues that Ms. Ashworth and the Social Security Administration determined that Leppert has no transferable skills, which, if true, would seriously undermine Liberty's conclusion that Leppert could perform additional occupations.

Leppert's argument is not supported by the record, however. Although Ms. Ashworth did initiate a vocational assessment for Leppert in 2012, as the district court correct noted, this

assessment was never completed. Leppert argues that the vocational assessment was terminated because Ms. Ashworth determined that Leppert lacked any transferable skills. For support, Leppert cites a notation made in his file on September 19, 2012 stating that Ms. Ashworth "CONCLUDED [Leppert] NOT A GOOD CANDIDATE FOR [Vocational] RETRAINING PROGRAM." (R. 11 PageID #92.) On its face, this notation does not state why Leppert was not considered a good candidate for a vocational retraining program—and it certainly does not state that Leppert had no transferable skills.

Moreover, the Social Security Administration's award letter does not state the basis for its finding that Leppert is disabled, and does not purport to conclude that Leppert lacked any transferable skills. In fact, when Leppert was examined for his Social Security benefits determination, Dr. Das concluded that he was capable of performing light work. When the Social Security Administration determines eligibility for disability benefits, it evaluates whether the applicant can perform "substantial gainful work that exists in the national economy." 20 C.F.R. § 404.1505(a). Determining whether an applicant can perform substantial gainful work involves consideration of a lengthy and complex list of criteria, many of which are different from the criteria the Plan uses to determine whether a claimant can perform "Any Occupation." *Compare id.* § 404.1574, *with* (R. 11, PageID #35). Without specific findings in the Social Security Administration's benefits award letter, it is not proper to assume that the Social Security Administration necessarily found that Leppert could not perform Any Occupation within the meaning of the Plan. *See, e.g.*, *Black v. Long Term Disability Ins.*, 582 F.3d 738, 748 (7th Cir. 2009) (explaining that the Social Security Administration's disability determination is not dispositive where "the Social Security Act's disability standard is different from that in the ERISA plan"); *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 950 n.9 (8th Cir. 2000) (same).

Accordingly, because there is no record evidence contradicting Ms. Reddinger's assessment that Leppert possesses transferable skills that could enable him to obtain light or

sedentary work, Liberty did not act arbitrarily and capriciously by accepting Ms. Reddinger's conclusions.

### C. Social Security Administration's Findings

Third, Leppert argues that Liberty failed to adequately explain why it rejected the Social Security Administration's disability findings in denying Leppert long term disability benefits. Although he does not say so explicitly, Leppert implies that the Social Security Administration found that he was totally disabled and could not perform any occupation in awarding him benefits.

Putting aside the fact that the Social Security Administration's determination was not binding on Liberty, *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 445–46 (6th Cir. 2009), Leppert's argument is once again not supported by the record. The Social Security Administration's award letter does not state the basis for its benefits determination; it merely notifies Leppert: (1) that he was entitled to benefits; and (2) of the effective date of those benefits. As the district court thus correctly noted, nothing in the record suggests that the Social Security Administration determined that Leppert could not perform Any Occupation as that term is used in the Plan. Rather, under existing Social Security regulations, Leppert could have been awarded benefits for a variety of reasons, including that he had been unable to find a job in the sluggish post-recession economy, *see* 20 C.F.R. § 404.1574(c)—a factor that the Plan expressly does not require Liberty to consider. Liberty therefore did not act arbitrarily or capriciously in failing to distinguish findings that were not reasonably present in the record.

Leppert also argues that Liberty was too conclusory in explaining why it did not follow the Social Security Administration's disability determination. In its letter rejecting Leppert's benefits appeal, Liberty discussed the Social Security determination as follows:

> In our review of Leppert's claim, Liberty Life has fully considered the Social Security Administration's (SSA) December 2011 ruling to approve Social Security Disability Income benefits under their rules for his disability beginning in April 2011. It should be noted, however, that while we fully consider the SSA's ruling, the determination by the SSA is not determinative of entitlement to benefits under the terms and conditions of the Triumph Group Inc. Group Disability Income Policy and our determination considered additional medical

16

and vocational reviews. Moreover, Liberty Life has obtained and considered more current medical records that were not considered by the SSA in its determination process.

(*Id.* PageID #120.) Because the Social Security Administration did not issue any findings contradicting Liberty's conclusions, Liberty was not required to say more than this. *See Cox v. Standard Ins. Co.*, 585 F.3d 295, 302 (6th Cir. 2009) ("We have previously upheld a denial of benefits where independent consultants reviewed the medical records and determined that the claimant was not disabled within the meaning of the policy, although the claimant had been declared disabled by the Social Security Administration."); *O'Bryan v. Consol Energy, Inc.*, 477 F. App'x 306, 308 (6th Cir. 2012) (upholding plan administrator's language distinguishing Social Security benefits award that stated, *inter alia,* that administrator "had additional medical evidence that the Social Security [Administration] did not").

Finally, the cases Leppert cites in support of this argument are distinguishable. In *DeLisle*, there was much stronger evidence that the administrator had failed to consider the Social Security Administration's findings because "none of the three denial letters [the administrator] sent [the claimant] mention[ed] her Social Security determination as a fact that [the administrator] considered in reaching its own determination," and only "one of [the administrator's] reviewers even acknowledged in his report that he was aware of the Social Security determination." 558 F.3d at 446. Likewise, in *Bennett v. Kemper National Services, Inc.*, 514 F.3d 547, 554 (6th Cir. 2008), the administrator "in its final benefits determination[] failed to discuss the SSA's determination that [the claimant] was 'disabled' under the Social Security Act." And in *Glenn v. Metlife*, 461 F.3d 660, 667 (6th Cir. 2006), *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. at 105, the administrator failed to discuss an explicit finding by an administrative law judge that the claimant was "totally disabled." Here, by contrast, Liberty expressly discussed the Social Security Administration's determination in Leppert's denial letter, and there are no explicit findings by the Social Security Administration that Liberty was required to specifically address.

### D. Leppert's Hand Ailments

Next, Leppert argues that Liberty failed to appropriately consider whether Leppert could perform the occupations identified in Ms. Reddinger's vocational report in light of Leppert's degenerative joint disease in his hands, which allegedly developed in 2013. Once again, Leppert's argument is not supported by the record. In order to see why this is so, we will briefly review the medical evidence in the record related to Leppert's hands.

In her December 12, 2011 report in connection with Leppert's application for Social Security disability benefits, Dr. Das noted that Leppert had no limitations in the feeling and use of his hands. Thereafter, in May of 2012, in connection with Leppert's benefits review for Liberty, Leppert told Ms. Ashworth that his left arm and fingers were going numb approximately twenty times per day. Ms. Ashworth delayed Leppert's vocational assessment pending an upcoming appointment with Dr. Assenmacher (Leppert's orthopedist), where Leppert planned to raise the issues with his left hand. However, as the district court correctly noted, Dr. Assenmacher's treatment notes make no reference to any problems with Leppert's hands. Then, in his April 8, 2013 examination report, Dr. Nadaud noted that Leppert had deformities in his fingers, and diagnosed him with degenerative joint disease of the hands. Dr. Nadaud did not note that these problems would limit Leppert's functional use of his hands, however. Finally, when Dr. Litow reviewed Leppert's medical files for his benefits appeal in 2014, she noted Dr. Nadaud's diagnosis and the deformities in Leppert's fingers, but did not recommend any additional occupational limitations based on this diagnosis.

In its benefits denial letter, Liberty stated:

> You also assert that Leppert has impairments with manual dexterity; however, no impairments, restrictions, or limitations have been supported to this end based on the medical reviews documented on file. Similarly, Dr. Das specifically indicated in the residual functioning capacity assessment that Leppert was unlimited with handling (gross manipulation), fingering (fine manipulation) or feeling.

(*Id.* PageID #92.)

Leppert argues that this language shows that Liberty does not believe that Leppert suffers from pain and numbness in his hands, and that Liberty's benefits denial therefore rested on an

improper credibility determination that Liberty should not have made as part of a file review. But Liberty did not say that it believed Leppert was malingering. Rather, Liberty accurately pointed out that there is no objective medical evidence in the record that Leppert's hand functionality is in any way impaired by his degenerative joint disease. The only evidence in the record, in fact, suggests that Leppert has no functional limitations with his hands. To wit, in 2011, Dr. Das specifically noted that Leppert's hand functionality was unlimited, and in 2014, Dr. Litow noted Leppert's deformities in his fingers but did not impose any new limitations on his ability to work. Because Leppert bore the burden of coming forward with objective medical evidence demonstrating that his hand problems would prevent him from performing Any Occupation, and he offered none, Liberty was entitled to credit the expert evidence in the file suggesting that Leppert's hand problems do not impair his functionality. *Whitaker*, 404 F.3d at 950; *Wilkins*, 150 F.3d at 614. Therefore, Liberty did not act arbitrarily or capriciously in failing to reject Ms. Reddinger's vocational assessment on the basis of Leppert's degenerative joint disease.

### E.  Transferable Skills Analysis

Leppert next argues that Liberty conceded in its benefits denial letter that he could only perform sedentary—and not light—work, and that therefore the only job Leppert could possibly perform of the four identified by Ms. Reddinger was "information clerk." Leppert argues that Liberty abused its discretion in determining that Leppert could be an "information clerk" because: (1) he lacks sufficient familiarity with computers to conform to that job's requirements; (2) his degenerative joint disease would impair his ability to type; and (3) due to the first two limitations, Leppert could not earn enough as an information clerk in order to approximate the amount he would receive in benefits.

Leppert's argument is not entirely without merit. He is a 60-year-old man without a college education who spent his entire life performing physical labor. The record is clear that Leppert possesses only limited computer skills. Liberty's determination that Leppert could

function as an "information clerk," which appears to require at least basic familiarity with ordinary office computer functions (R. 11 PageID #196), is difficult to credit.

Nevertheless, according to the terms of the Plan, Leppert is not entitled to long term disability benefits if there is "Any Occupation" he is competent to perform. And Leppert's assertion that Liberty "conceded" that he could only perform sedentary as opposed to light work is a straw man. Liberty's benefits denial letter makes no such concession, and in fact, as noted earlier, the expert evidence in the record is unanimous that Leppert is competent to perform light work. Accordingly, if Liberty was reasonably justified in concluding that Leppert could perform any of the four occupations identified by Ms. Reddinger, Leppert's appeal must fail.

At least two of the occupations identified by Ms. Reddinger—small products assembler, and security guard (e.g., badge checker)—do not appear to require any particular facility with computers. Accordingly, because Leppert has not carried his burden to show either that his physical limitations would prevent him from performing those jobs, or that those jobs require skills that he could not reasonably acquire at his age and experience level, Liberty did not abuse its discretion in determining that Leppert is not entitled to long term disability benefits.[2]

### F. Liberty's Conflict of Interest

Finally, Leppert argues that the record shows that Liberty's benefits denial was directed by its structural conflict of interest as the party that both funds the disability benefits, and makes benefits determinations. Leppert argues that Liberty's conflict is apparent from: (1) its decision to credit Ms. Reddinger's vocational assessment over Ms. Ashworth's without explanation;

---

[2] Leppert repeatedly asserts that Ms. Reddinger's vocational skills analysis is unreliable because she found that Leppert can perform "sedentary-light," which is not a formally recognized work category under Social Security regulations. *See* 20 C.F.R. § 220.132. Leppert's argument requires an untenably wooden interpretation of the term "sedentary-light." The applicable regulations provide that in most cases, a claimant that can perform light work can also perform sedentary work. *See id.* § 220.132(b). In context, when the experts that reviewed Leppert's file use the term "sedentary-light," they are not referring to some imagined hybrid work category— as Leppert argues—but rather are stating that Leppert can perform work in either the sedentary or light categories. That Leppert can perform light work is supported by Dr. Das' express finding to that effect.

(2) its decision to improperly discount the Social Security Administration's disability determination; and (3) Ms. Reddinger's use of the 50th–75th percentile wage data to calculate whether Leppert could make enough money as a Small Products Assembler and Electronic Assembler, while using 25th–50th percentile wage data for the other two occupations she identified.

Leppert's first two grounds do not lend support to his argument that Liberty was biased. As explained *supra*, sections III.B–C, there are no conflicting vocational assessments in the record, and Liberty did not improperly discount the Social Security Administration's disability determination.

However, Leppert is correct that Ms. Reddinger's arbitrary use of wage data is troubling. In order to determine whether Leppert could make enough money in any of the four occupations she identified to roughly approximate what Leppert would receive in disability benefits, Ms. Reddinger used labor statistics to determine the salary ranges for those occupations. But she offered no explanation for why she chose to use 50th–75th percentile salaries for two of the occupations, while using the 25th–50th percentile data for two others. Without context, Ms. Reddinger's inconsistent use of wage data seems arbitrary and unprofessional, at a minimum. Leppert's inference that Ms. Reddinger manipulated the wage data in order to find additional occupations that Leppert could perform at an appropriate salary level certainly seems plausible.

Nevertheless, as we noted earlier, the importance of Liberty's structural conflict of interest varies based on the strength of Leppert's other evidence suggesting that Liberty's benefits determination was arbitrary and capricious. *Glenn*, 554 U.S. at 117. Leppert put forward no objective medical evidence, as the Plan required, demonstrating that he is unable to perform the Material and Substantial Duties of Any Occupation. The record, moreover, is replete with expert evidence suggesting that Leppert can perform light-to-sedentary work. Accordingly, we hold that in spite of the irregularities in Ms. Reddinger's analysis, Leppert has not shown that Liberty acted arbitrarily and capriciously in determining that he is not disabled.

**CONCLUSION**

For the foregoing reasons, we hold that Liberty did not act arbitrarily or capriciously in making Leppert's benefits determination. Accordingly, we **AFFIRM** the district court's judgment.